## CASE NO. 23-4339

IN THE

# 𝕷𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

CHRISTOPHER WILLIAM KUEHNER,

*Defendant - Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

## OPENING BRIEF OF APPELLANT

Lana Manitta
LAW OFFICE OF LANA MANITTA, PLLC
140B Purcellville Gateway Drive
#511
Purcellville, VA 20132
703-705-4428
lmanitta@manittalaw.com

*Counsel for Appellant*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... iii

JURISDICTIONAL STATEMENT ............................................................ 1

STATEMENT OF ISSUES ........................................................................ 1

STATEMENT OF THE CASE .................................................................... 2

SUMMARY OF ARGUMENT .................................................................... 4

ARGUMENT .............................................................................................. 6

I.    The District Court Erred in Denying Mr. Kuehner's Motion to Vacate Because, Had the Defense Been in Possession of the Google and Discord Subpoena Returns for Use at Trial, there is a Reasonable Enough Likelihood of a Different Result to Undermine Confidence in the Verdict.......................................................... 6

     i.    The Google Subpoena Result Directly Supported the Defense Theory that someone else used the Nechris Account ................................................................................. 8

     ii.    The Discord Activity that Could be Associated with Mr. Kuehner, Dating Back to 2020, Was Very Different from Nechris' Activity on rapey.su ...................................... 10

II.   The District Court Should Have Vacated Mr. Kuehner's Conviction and Sentence, and Dismissed the Case, as an Appropriate Sanction for the *Brady* Violation ......................... 11

III. The District Court Erred in Ruling that the "In Concert" Element of 18 USC 2252A(g) May be Met by Combining the Predicate Offenses ..................................................................... 12

i

        i.   18 U.S.C. § 2252A(g) Was Passed to Create a "New Crime," Not Simply Punish Already Existing Offenses More Harshly.................................................................12

        ii.  The Rule of Lenity Should Apply..................................14

IV.   The Evidence Was Insufficient to Convict Mr. Kuehner of the Offense Charged.....................................................................17

        i.   Use of the Nechris Username by an Administrator such as Larson Was Possible and Changes to the Nechris User Profile Indicate Use by Someone Other than Mr. Kuehner...........19

        ii.  Evidence is Insufficient to Prove Each—or Even the Collective "All"—of the Predicate Acts was Performed "In Concert" With at least Three Other Persons ..................................23

CONCLUSION...........................................................................................27

REQUEST FOR ORAL ARGUMENT ................................................................27

# TABLE OF AUTHORITIES

## Cases

*Brady v. Maryland*,
    373 U.S. 83 (1963) ................................................................................. 1

*Harrell v. Freedom Mortgage Corporation*,
    976 F.3d 434 (4th Cir. 2020) ............................................................... 12

*Kyles v. Whitley*,
    514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) .................. 7

*Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*,
    827 F.3d 333 (4th Cir. 2016) ............................................................... 17

*United States v. Bagley*,
    473 U.S. 667, 105 S. Ct. 3375 (1985) .............................................. 6, 7

*United States v. Daniels*,
    653 F.3d 399 (6th Cir. 2011) .......................................................... 13, 14

*United States v. DeFoggi*,
    839 F.3d 701 (8th Cir. 2016) ........................................... 13, 14, 25, 26

*United States v. El-Battouty*,
    38 F.4th 327 (3d Cir. 2022) ............................................................ 13-14

*United States v. Grovo*,
    826 F.3d 1207 (9th Cir. 2016) ....................................... 13, 14, 25-26

*United States v. Parker*,
    790 F.3d 550 (4th Cir. 2015) ............................................................ 6, 11

*United States v. Wiltberger*,
    18 U.S. 76, 5 L. Ed. 37, ___ (1820) ................................................... 15

## Statutes

18 U.S.C. § 848 .................................................................................. 14, 15

18 U.S.C. § 2251 ........................................................................... 18, 25, 27

18 U.S.C. § 2252 ........................................................................... *passim*

18 U.S.C. § 3231 ................................................................. 1

28 U.S.C. § 1291 ................................................................. 1

## Other Authorities

152 Cong. Rec. S8012-02, 2006 WL 2034118 (2006) .......................................... 12

Fed. R. Crim. P. 5 ...................................................... 1, 4, 5, 11

Fed. R. Crim. P. 33 ................................................................. 4

HR 4472, 109th Congress, 1st and 2d Sessions ................................................ 13

Model Crim. Jury Instr. 8th Cir. 6.18.2252A(g) (2021) ........................................ 14

PL 109–248, July 27, 2006, 120 Stat 587 .............................................. 12

## JURISDICTIONAL STATEMENT

Appellant Christopher Kuehner was indicted on one count of violating 18 U.S.C. § 2252A(g) and the district court exercised jurisdiction over his case pursuant to 18 U.S.C. § 3231. JA15. Mr. Kuehner's original Judgment & Commitment Order was entered on April 25, 2023, JA456, and his first Notice of Appeal was filed on May 9, 2023. JA526. An Amended Judgment & Commitment Order was entered on May 31, 2023, JA532, and an Amended Notice of Appeal was filed on June 2, 2023. JA540. This Honorable Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

I.    The district court erred in denying Mr. Kuehner's Motion to Vacate because, had the defense been in possession of the Google and Discord subpoena returns for use at trial, there is a reasonable enough likelihood of a different result to undermine confidence in the verdict. JA464, JA525.

II.   The district court erred in denying Mr. Kuehner's Motion to Vacate and Dismiss, as this would have been the proper sanction for the United States' violation of Fed. R. Crim. P. Rule 5f and *Brady v. Maryland*, 373 U.S. 83 (1963) ("*Brady*"). JA18, JA40,

III.  The district court erred in ruling that the language of 18 U.S.C. § 2252A(g)(2) requiring that predicate offenses be performed "in concert with at least three others" does not require proof that *each* predicate offense be performed in concert with at least three others. JA348.

IV.   The district court erred in finding the evidence sufficient to sustain a conviction. JA330.

## STATEMENT OF THE CASE

On July 14, 2022, Mr. Kuehner was charged in a one-count Indictment with engaging in a child exploitation enterprise. 18 U.S.C. § 2252A(g); JA14. The case arose out of activities on the "rapey.su" website, which was designed, operated, administered, and controlled by co-defendant Nathan Larson, who died in prison awaiting trial on this and a case out of California. JA14; JA546. Mr. Kuehner registered with the site on September 27, 2020, with username "Nechris." JA551. Over the course of the next few weeks, Nechris posted comments in rapey.su's Siropu "chat" (a constant, continuously scrolling message board), JA144, participated in private, sexually explicit chats with minor (i.e., underage) users of the site, JA122, and through such communications solicited material of an explicit nature from minor users of the site. *See, e.g.,* JA102, JA106, GEX215A at 21, GEX216B, GEX216D; JA120, GEX234, GEX235, GEX235B.

Although a forensic examination of ten of Mr. Kuehner's devices found references in forensic data to a few filenames matching explicit files from the site, JA239-240, JA243, or including usernames from the site, JA240-241, no sexually explicit images let alone images of child pornography were found on *any* of Mr. Kuehner's devices seized by law enforcement, JA251, and it therefore could not be proved that Mr. Kuehner downloaded or even viewed the files in question, let alone that they were sexually explicit.

The primary defense theory presented at Mr. Kuehner's bench trial was that since administrators of the rapey.su website—the most likely culprit being the founder, designer, and operator of the site Nathan Larson—could access user accounts, there was insufficient proof that Mr. Kuehner himself had performed all the acts comprising the alleged predicate acts, and therefore insufficient proof of his guilt to the offense charged. JA292, JA314-323. In support of his argument, Mr. Kuehner highlighted the fact that on October 6, 2020, the profile for username Nechris was changed in various ways, most notably changing his email address from necryz@gmail.com to mc3996520@gmail.com. GEX213, 213A.

A secondary but related theory involved the interpretation of 18 U.S.C. § 2252A(g)—specifically the "in concert" element. JA322. First, Mr. Kuehner submitted that the district court should interpret the statute to require that *each* predicate act be performed in concert with at least three others. *Id.* Second, he argued that the actions of user Nechris were performed alone, for his own purposes, from behind a computer keyboard, not in concert with others. *Id.* The district court disagreed on both points, JA348-351, and Mr. Kuehner was convicted on January 24, 2023. *See* JA330.

Post-trial, Mr. Kuehner, by and through counsel, requested the government to produce the returns of administrative subpoenas, especially one sent to Google for subscriber information for the email mc3996520@gmail.com. JA508-509. In

response, the government produced, for the first time *post-trial*, returns from Google *and* Discord which had been obtained in September, 2021 that showed that the mc3996520@gmail.com was not registered to Mr. Kuehner and a Discord account username linked to that email, believed to be associated with Mr. Kuehner, did not exist. JA488.

On April 25, 2023, Mr. Kuehner was sentenced to the statutory mandatory minimum of 240 months, with credit for time served. JA456, JA532. Based on the government's *Brady* violation, Mr. Kuehner sought to have his conviction and sentence vacated pursuant to Fed. R. Crim. P. 33 and the case dismissed on the grounds that the United States had violated its obligations pursuant to Fed. R. Crim, P. 5f and *Brady*. JA465. Although the district court ruled a *Brady* violation had occurred, JA515, The Honorable Leonie M. Brinkema also held that even had the withheld evidence been introduced at trial, it would not have "made a material difference to the outcome." JA516. This appeal follows.

## **SUMMARY OF ARGUMENT**

Mr. Kuehner's primary factual defense was that an administrator of the Rapey.su website could have operated on the site behind the username Nechris at any time, committing one or more of the predicate acts. The court's ruling that the defense theory was "implausible," JA310, would likely have been different had the evidence from the Google subpoena return been available to Mr. Kuehner for use at

4

trial. For this reason, as well as to sanction the government for its blatant violation of Fed. R. Crim. P. 5(f) and *Brady*, Mr. Kuehner's conviction should have been set aside.

Mr. Kuehner's challenge to the government's case provided sufficient reasonable doubt as to the question whether it was in fact *him* performing each of the acts alleged to have comprised the predicate offenses, let alone having done so in concert with at least three others as should be required based on the plain language of the statute. In truth, the government's case proved only that Mr. Kuehner *likely* committed one or more of the predicate offenses, but that he did so as an individual actor and for his own prurient interest—not as the concerted effort that characterizes an "enterprise."

Related to this is was Mr. Kuehner's secondary defense, which he submits is a prejudicial and constitutionally deficient interpretation of the "in concert" element of 18 U.S.C. § 2252A(g) which misdirects the statute toward non-enterprise activity of individuals, thereby undermining the force and focus of the narrowly tailored legislation and exposing non-enterprise conduct to a 20-year prison sentence instead of the sentences already set for that very conduct, including that conduct engaged in as part of a conspiracy.

## ARGUMENT

I.   **The District Court Erred in Denying Mr. Kuehner's Motion to Vacate Because, Had the Defense Been in Possession of the Google and Discord Subpoena Returns for Use at Trial, there is a Reasonable Enough Likelihood of a Different Result to Undermine Confidence in the Verdict.**

The standard of review applicable to the denial of Mr. Kuehner's motion is abuse of discretion, but as it is an abuse of discretion for the district court to commit legal error, the underlying determination with respect to the *Brady* violation is reviewed *de novo*. *See United States v. Parker,* 790 F.3d 550, 558 (4th Cir. 2015), citations omitted (dealing with Motion for New Trial on grounds of *Brady* violation). Factual findings accompanying the district court's legal determination are reviewed for clear error. *Id.*

"[F]avorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *United States v.* Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383 (1985); *id.,* at 685, 105 S.Ct., at 3385 (White, J., concurring in part and concurring in judgment). Thus, the "showing of materiality" does not require a showing that the disclosure of the evidence in question *would have* resulted in acquittal. *Id.,* at 682, 105 S.Ct., at 3383–3384.

The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its

absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley*, 514 U.S. 419, 433–34, 115 S. Ct. 1555, 1565–66, 131 L. Ed. 2d 490 (1995) *citing Bagley,* 473 U.S. at 678, 105 S.C.t at 3381. As in *Kyles*, the "disclosure of the suppressed evidence to competent counsel" in Mr. Kuehner's case would have made a different result reasonably probable." *Kyles*, 514 U.S. at 441, 115 S. Ct. at 1569, 131 L. Ed. 2d 490.

The evidence at issue in Mr. Kuehner's Motion to Vacate was the results of Administrative Subpoenas sent to Google and Discord on September 27, 2021. JA478-483, JA488. This information was exculpatory evidence that the government did not disclose. In fact, it was direct evidence that was key to and supportive of the very theory of defense Mr. Kuehner developed at trial solely through his challenge via cross-examination to the government's case. *See* JA466-489, JA510-524. Moreover, the district court's request that the government address availability of lesser included offenses, JA322, is indicative that indeed, the presentation of direct evidence supporting Mr. Kuehner's defense that not all of the incriminating chats and posts were in fact his own likely could have altered the ultimate determination of guilt, especially as to the narrow and specific offense charged in the Indictment.

7

**i.** **The Google Subpoena Result Directly Supported the Defense Theory that someone else used the Nechris Account.**

On December 7, 2021, Mr. Kuehner was interviewed by law enforcement, he admitted registering for the rapey.su website and provided the email address he used, necryz@gmail.com. GEX703, GEX703A. He never mentioned—and was notably *never asked* about the mc3996520@gmail.com address. *Id.* By that time, however, the Google subpoena returns for both email addresses had already been received, and agents therefore knew that the mc2996520@gmail.com address came back to a "John McJanal." JA482. The only evidence of that email address showing up on any of Mr. Kuehner's devices is evidence of emails *sent to the* necryz@gmail.com address on June 6, 2021—months after the relevant time period in this case—attempting to verify a Discord account for user Nekryz#9079. JA484. Despite the mc3996520@gmail.com being added to the Nechris rapey.su profile in October 2020, these June, 2021 *incoming* emails to Mr. Kuehner's actual email address are the first and only mentions of this second email address existing anywhere on Mr. Kuehner's devices. And again, they do not arise from him *using* that email address. *See id.*

There was no evidence adduced that Mr. Kuehner registered or used the mc3996520@gmail.com email address, or that he even responded to the authentication emails sent by Discord to the necryz@gmail.com address on June 6, 2021. The evidence from Google is only that "John McJanal" was the subscriber to

the mc3996520@gmail.com address, and that the email address was last accessed at the end of June 2021 from IP addresses not associated with Mr. Kuehner. JA484. Adding to the suspicion surrounding this second email address is the Discord subpoena return. JA488. Discord was unable to locate a user by the name Nekryz#9079. *Id.* The most logical conclusion from the subpoena returns and history of mc3996520@gmail.com showing up within Mr. Kuehner's *actual* emails is this: as late as June 2021, an attempt was made by someone other than Mr. Kuehner to register a new Discord user account but was unsuccessful because no one authenticated the mc3996520@gmail.com address. It is unclear if the emails seeking authentication were even *opened*, but they certainly were not responded to, and the new Discord account was never set up. This too supports the argument that since the original Nechris profile was changed, someone else was impersonating Mr. Kuehner on various platforms.

Had Mr. Kuehner's counsel been able to utilize this evidence during cross examination of the agents tasked with forensic analysis of his devices, of Agent Cottrell's testimony regarding there being "no evidence" of impersonation, and of Agent Gallegly who interviewed Mr. Kuehner months after the subpoena return yet failed to ask about this second email address, this would have significantly undermined the prosecution's case when it mattered—i.e., during the course of the trial. There is certainly at least a reasonable probability that the court's ruling, which

was based on the implausibility of the impersonation defense—would have been different.

ii.     ***The Discord Activity that Could be Associated with Mr. Kuehner, Dating Back to 2020, Was Very Different from Nechris' Activity on rapey.su***

Various victim witnesses described interacting with Mr. Kuehner through a separate platform called "Discord" in October and November 2020. JA183, JA208. The Discord group was a more "close-knit community" that did not require posting material, like the rapey.su site. JA183, JA199. The Discord interactions described were private interactions, and the witnesses did not offer exact types of content solicited by Mr. Kuehner on this platform except "nudes," or "undressed." JA182, JA208. In fact, the descriptions of these interactions, which were "mainly voice calls" JA180, that were often "odd, but not outright explicit," JA209, "sometimes sexually explicit" but other times "just general conversation," JA180, stood in stark contrast to the exhibits produced from the rapey.su site of Nechris' activity, which often involved very specific requests for highly explicit material. *See, e.g.,* JA180-181. Also notable was that one witness discussing her known interactions with the actual Mr. Kuehner was that, although *another* user was "constantly asking to see people pee," Mr. Kuehner hadn't ever showed no apparent interest in this type of material. JA207. The fact that in a more "close-knit" group, ostensibly run by Mr. Kuehner, he was less demanding, less explicit, less aggressive, and displayed

different predilections than Nechris, is also indicative that others may have been behind that username at various times relevant to the predicate acts.

The availability of this evidence as well—that a *different* Discord account was associated with the second email address not belonging to Mr. Kuehner was nearly created months after the relevant period—would have provided *even more* support to the impersonation defense and thereby a reasonable probability of a different result.

## II. The District Court Should Have Vacated Mr. Kuehner's Conviction and Sentence, and Dismissed the Case, as an Appropriate Sanction for the *Brady* Violation

The standard of review is, again, abuse of discretion as to the denial of the motion with a *de novo* review of the underlying legal determination and a review of the related factual findings for clear error. *Parker, supra.*

Dismissal of the indictment is an available and appropriate remedy for violations of Fed. R. Crim. P. 5f and *Brady*. The Court's Rule 5f Order warns the government of this very potential consequence, and given the gravity of the evidence in question, it would have been appropriate. JA18. Instead, there was no consequence at all, except the grave prejudice to Mr. Kuehner, despite the finding that there was, indeed, a *Brady* violation. JA515.

**III. The District Court Erred in Ruling that the "In Concert" Element of 18 USC 2252A(g) May be Met by Combining the Predicate Offenses**

This Court reviews the district court's statutory interpretation *de novo*.

*Harrell v. Freedom Mortgage Corporation*, 976 F.3d 434 (4th Cir. 2020)

### i. *18 U.S.C. § 2252A(g) Was Passed to Create a "New Crime," Not Simply Punish Already Existing Offenses More Harshly*

In 2006, Congress enacted the Children's Safety and Violent Crime Reduction Act, or the Adam Walsh Act ("Walsh Act"). PL 109–248, July 27, 2006, 120 Stat 587. Title VII of the Walsh Act included the Internet Safety Act and added subsection (g) to 18 U.S.C. § 2252A. *Id.* The objective of "tough new penalties for child exploitation enterprises" was aimed at "dramatically increas[ing] internet safety." 152 Cong. Rec. S8012-02, 152 Cong. Rec. S8012-02, S8018, 2006 WL 2034118. Subsection (g) was not simply an increased penalty for existing offenses, but rather it "created a new crime outlawing child exploitation enterprises, [which] would imprison for a mandatory minimum sentence of 20 years those who act in concert to commit at least three separate violations of Federal child pornography, sex trafficking, or sexual abuse laws against multiple child victims." *Id.* The "new crime" was created "to prosecute the "molestation on demand" child pornographic industry." *Id.* Not surprisingly, the Act enjoyed bipartisan support in both houses of Congress. *See id.*

But the early versions of the legislation that evolved into the Adam Walsh Act did not include the "new crime" created by 2252A(g) and were more broadly aimed at "protecting children, to secure the safety of judges, prosecutors, law enforcement officers, and their family members, to reduce and prevent gang violence, and for other purposes." HR 4472, 109th CONGRESS, 1st and 2d Sessions. Therein, the word "enterprise" was used only in relation to criminal street gangs and racketeering enterprises. *Id.* Yet, the statute creates not only a "new crime," but a new criminal "enterprise" defined by the very specific elements. 18 U.S.C. § 2252A(g).

Unfortunately, the statute is being used to merely punish crimes that already exist more harshly rather than target the specified "new crime," and this misapplication is a direct result of the misinterpretation of the "in concert" element. The circuits that have taken up the question as to whether each predicate offense must be performed in concert with three or more other persons have decided—with little support from the legislative history or the language of the Act, and in contravention of tenets of statutory interpretation—that for purposes of two of the elements of the offense ("in concert with" and number of victims) the predicate offenses may be tallied together. *See United States v. Daniels,* 653 F.3d 399 (6th Cir. 2011); *United States v. DeFoggi¸* 839 F.3d 701 (8th Cir. 2016); *United States v. Grovo,* 826 F.3d 1207 (9th Cir. 2016); *United States v. El-Battouty*, 38 F.4th 327 (3rd

13

Cir. 2022); *see also* Model Crim. Jury Instr. 8th Cir. 6.18.2252A(g) (2021), Model Crim. Jury Instr. 8th Cir. 6.18.2252A(g) (2021). This Court should find otherwise.

### ii.    *The Rule of Lenity Should Apply*

The relevant language of the statute is as follows:

> A person engages in a child exploitation enterprise for the purposes of this section if the person violates section 1591, section 1201 if the victim is a minor, or chapter 109A (involving a minor victim), 110 (except for sections 2257 and 2257A), or 117 (involving a minor victim), as a part of a series of felony violations constituting three or more separate incidents and involving more than one victim, and commits those offenses in concert with three or more other persons.

18 U.S.C. 2252A(g)(2).

Circuit courts tasked with interpreting this language have all at least implicitly acknowledged a lack of clarity with respect to the "in concert" element and some turned to precedent interpreting a different statue with "similar language"—18 U.S.C. § 848(c)—for guidance. *Daniels,* 653 F.3d at 412; *DeFoggi*, 839 F. 3d at 710; *Grovo*, 826 F. 3d at 1215. The Third Circuit, looking at the statute only last year, undertook to analyze the 2252A(g) itself, ultimately concluding that the absence of the word "each" in the phrase "commits those offenses" means that the phrase "in concert with three other persons" applies to the "series of offenses," not to each individual offense. *El-Battouty*, 38 F. 4th at 329.

Mr. Kuehner submits that the approach taken by the Third Circuit—considering the language of the statute independent of those with "similar language,"

is the better approach, given the fact that the *dissimilarities* between 2252A(g) and 848(c) renders the latter unfit for this purpose. However, the Third Circuit failed to apply a tenet of statutory construction that ensures due process as guaranteed by the 5th Amendment. Where there is ambiguity, the rule of lenity should apply.

"The rule that penal laws are to be construed strictly . . . . [] is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment." *United States v. Wiltberger*, 18 U.S. 76, 95, 5 L.Ed. 37, ___ (1820). While strict construction should not subvert the clear intention of the legislature,

> The case must be a strong one indeed, which would justify a Court in departing from the plain meaning of words, especially in a penal act, in search of an intention which the words themselves did not suggest. To determine that a case is within the intention of a statute, its language must authorize us to say so. It would be dangerous, indeed, to carry the principle, that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated. If this principle has ever been recognized in expounding criminal law, it has been in cases of considerable irritation, which it would be unsafe to consider as precedents forming a general rule for other cases.

*Id.* at 96, 5 L.Ed. at ____.

Mr. Kuehner submits that the Third Circuit is incorrect in finding that the phrase "those offenses" means the collective "series of felony violations" instead of individual *offenses*. The words "series" and "violations" were clearly chosen to

15

distinguish the "series" from the enumerated offenses mentioned immediately preceding that clause. In fact, there are "offenses" mentioned in the statute. They are "violations of section 1591, section 1201 . . ., chapter 109A, 110, or 117." It is to *these* that "commits *those offenses*" refers.

While the Third Circuit makes much of the fact that the words "each of" are missing (and shouldn't be implied), they aren't in fact necessary so long as one carefully considers to what "those offenses" actually refers. To confirm that this reading is the more reasonable, especially in light of the rule of lenity, it is important to note some other things that the legislature did not say, but could have:

" . . . as part of a series of felony *offenses* constituting three or more separate incidents and involving more than one victim, and commits those *offenses* in concert with three or more other persons."

OR

" . . . as a part of a series of felony violations constituting three or more separate incidents and involving more than one victim, and *commits that series of violations* in concert with three or more other persons."

OR

" . . . as a part of a series of felony *offenses* constituting three or more separate incidents involving *a total of two or more* victims, and commits those offenses in concert with a *total of three or more* other persons."

16

By returning the readers attention to "offenses," rather than the "series" or "the violations," it is actually fairly clear what the legislature meant, but to the extent ambiguity exists, the statute should not be read to *expand* its reach—especially to cover conduct already criminalized, including as the object of conspiracy, elsewhere within the very titles mentioned in 2252A(g).

Finally, the reading that allows the "at least three other persons" to be tallied over the "series of violations," undermines the requirement for "three separate incidents," and further allows for the possibility that someone could perform two predicate acts *completely alone* and *only one* in concert with three people, and *still* be convicted of engaging in an enterprise based on those three predicate acts.

A telling exchange on this point occurred at trial when the government asked co-defendant Matthew Martin whether he committed his offense "alone or alongside others," and he said, "alongside others." JA222. The government chose the word "alongside" which is more accurate and is *not* the same as "in concert with."

## IV. The Evidence Was Insufficient to Convict Mr. Kuehner of the Offense Charged

This Court reviews the judgment resulting from a bench trial using a "mixed standard." *Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016). "Factual findings may be reversed only if clearly erroneous, while conclusions of law are examined *de novo*." *Id.*

The district court found that Mr. Kuehner committed five predicate acts—specifically five separate violations of 18 U.S.C. § 2251(a) and (e) (production or attempted production of child pornography). JA345-346. Each of the predicate acts found by the court involved Nechris interacting in a rapey.su message exchange with other site users, who were under the age of eighteen, asking them to produce video depictions of themselves engaging in sexually explicit activity. *Id.* In one such request, user Nechris asked for a "pee video," JA114-116, which Mr. Kuehner submits is not necessarily "sexually explicit material." No request was made to show genitalia, or in fact any body part, or even nudity, and in fact no such content was produced. JA207.

The district court found the defense of impersonation "implausible," but in its oral ruling post-trial referred to the defense being that Larson "fully" impersonated Mr. Kuehner on the site, JA327, which was not the defense. The defense was that because Larson (or any other administrator but most likely Larson) could impersonate Mr. Kuehner, and because there were as the district court describes them "inexplicable changes" to Nechris' profile indicating as much, that the government could not prove commission of the predicate acts by Mr. Kuehner beyond a reasonable doubt. *See, e.g.,* JA322-323.

### i.   Use of the Nechris Username by an Administrator such as Larson Was Possible and Changes to the Nechris User Profile Indicate Use by Someone Other than Mr. Kuehner

Site administrators could have been behind the activities of Nechris by simply changing the password. GEX213, GEX213A. On October 6, 2020, changes were made to Nechris' profile including his height, his eye color, his race, his home state, and his email address. JA155. One site user testified at trial that she could not go in and change her own username without moderator or administrator permission. JA199. And on direct examination Agent Fottrell unequivocally confirmed that site administrators has the following capability:

> So, for example, . . . when an administrator was logging – somebody was logging in as Leucosticte [one of Larson's many usernames] and then changing the password to Nechris so they could log in. We don't know what Nechris's password is. If we wanted to log into them, the administrator has the ability to change his password to something else. So now that we changed his password to something else, we could log in as the user. But we don't know what Nechris's original password was; the administrator just has the ability to change it to something else.

JA141. Nathan Larson was the "admin of all admins," as the individual who set up the site, served as administrator and moderator. JA148. He had access to an administrator portal behind the scenes of the site. *Id.* He could and did edit user profiles. JA149-150. He could also change user passwords. JA150-151. And rapey.su did not require two-factor authentication for login, only the password. JA152.

Agent Fottrell insisted however, that impersonating a user would be "a difficult task," JA152, but his testimony only bears out that it might be difficult to *avoid detection*. JA152. Various logs, for example, would show changes made to profiles, etc. JA153. But not everyone even had access to those logs, only administrators. JA153, JA168.

On redirect examination, Agent Cottrell was asked how he knew there was "no evidence" someone had impersonated Nechris. Agent Cottrell's response was not a response, but a deflection. He could only repeat what he had said earlier, that "in [his] mind, it's a very difficult problem to fake somebody logging in as Nechris." JA163. In fact, it's not difficult at all:

First, Agent Cottrell said, "I'd have to know his password." JA163. But this had already been confirmed on direct (see above), JA141, and during cross, through this exchange:

> Q . . . [Larson] could go into their profile and he could make changes?
> A Correct.
> Q And he could even change someone's password?
> A *He could change somebody's password, absolutely*.
> Q Now, you testified on direct that he doesn't know their password, but he can change it?
> A Right. Correct.

JA150 (emphasis added). And we know that changes *were made* to Nechris' profile. JA151-152.

Second, Agent Cottrell said, "I'd have to geolocate and login from an IP address that looks like his." JA163. Well, no. *Only to cover one's tracks in the IP logs* would one need to do this, and it would only involve signing in to the site through IP address within the same geolocation as the user. JA153. Once again, therefore, logging in as someone else was not difficult at all, and in fact, evidence showed that some of Nechris' activities on the site came from IP addresses linked to a Comcast "home-based" IP address, but other activity came from IP addresses that *were* routed through third-party IP address providers. JA159-160. These IP addresses were basically "rented" through Leaseweb, and do not associate with a user's computer, but rather Leasweb's server. JA160-161. Some were in the Seattle, Washington area, but some were even in California (the very place Larson was ultimately arrested after kidnapping a 12-year-old he met on the site in Colorado). JA166. Larson could have easily done this by "spoofing" his location to another location, simply adding another layer to his connection (i.e., routing through the third-party provider IP address) allowing his activity from his home in Virginia, or anywhere else, to reflect an IP address elsewhere. JA166. Importantly, there was no evidence offered at trial that Mr. Kuehner ever contacted, let alone contracted or subscribed to Leaseweb services—or any third party—for an offsite IP address. Ten of his devices were seized and analyzed, and there was no evidence of any such service being used, website being access, subscription being paid, etc.

21

The "difficult task" would be *covering it up*, JA153. But "covering it up" was defined by Agent Fottrell as eradicating all trace of the impersonation, which would not be necessary if the user would not have access to the relevant logs Regardless there is no reason to assume that Larson would need to or try to "cover it up," even though he could. JA153. Larson set up this site and he set it up to allow himself to change user passwords and sign in as other users. JA149-150. Larson could have chosen to require two-factor authentication, securing user profiles from impersonation (including by law enforcement). JA154. But he did not set it up that way, likely *because* it would have limited *his ability* to sign in as other users. JA154-155.

As Carl Sagan said, "absence of evidence is not evidence of absence," and so "no evidence" of impersonation would not mean it didn't happen. But we *do* have evidence that Nechris' profile was changed, including the crucial inclusion of a new email address. Knowing that Larson could do it easily, it *doesn't matter* whether it would have been difficult to cover his tracks, since that was the least of what Larson was trying to hide with the rapey.su site. Larson was hardly concerned about law enforcement let alone other users, but regardless, if someone tried to sign into their account and had trouble, *they would reach out to Larson for help*.  If someone thought they were "hacked," *they would reach out to Larson for help*. And if someone thought *Larson* hacked them, to whom would they complain? More likely

than not, the user (fearing perhaps law enforcement detection), would abandon the profile altogether, allowing Larson to continue to use their username indefinitely. It's a "no lose" situation for him, and the idea that it would be "difficult" to hide is of absolutely no consequence. It was possible, then there is no way to prove beyond a reasonable doubt that Mr. Kuehner committed each of the predicate acts associated with username "Nechris" (let alone "in concert with at least three others").

> ii.     **Evidence is Insufficient to Prove Each—or Even the Collective "All"—of the Predicate Acts was Performed "In Concert" With at least Three Other Persons**

The Siropu chat feature of the site—often referred to at trial as a "group chat" which is a bit misleading—is a continuous streaming and scrolling message board; so, a user signing on can't see all of the discussions going on and isn't necessarily intending to engage with everyone looking at the scroll while posting. JA144. A small portion of the messages, covering only the very most recent activity, shows on the user's screen. What is visible may be anything at that point from one-off posts directed at no one in particular, or a discussion between two or more users. Even when one is aware that multiple people are viewing the scroll, users can direct their comments to specific users explicitly by "tagging" them or implicitly by simply engaging *only* with that other user (e.g., by responding to their comments and questions to the exclusion of others). *See,* JA104. As the posted messages scroll by on the screen, only if one actively scrolled backward could they see earlier posts.

The experience of the group chat is therefore akin to entering a large room which is sometimes empty and sometimes packed with people. If one chooses to "talk" to another person one has no idea who is actually "listening to" (i.e., reading) your conversation. But that doesn't mean one is intentionally talking to everyone in the room every time they walk in the room. Nechris' activity in the Siropu chat was sometimes a "private conversation" in the larger room, and sometimes a conversation that invited others to weigh in. But those forming the predicate acts were not of the latter sort.

The first predicate act involving the solicitation of sexually explicit material by Nechris arises from, as Agent Cottrell described it, a "chat between the user Bananacabana and Nechris," and later postings within the group chat directed specifically to Bananacabana by Nechris. JA106, JA108. The "pee video" request by Nechris to user Yoonji also arises in the group chat, and JA117. A discussion about producing a video takes place within the group chat but is between Nechris and Lilith. JA120. The request for material from Skinny.freakkk occurs in a private chat, seeking a video "just for me." JA122. While Nechris discusses looking forward to the material video with other users, JA123, the solicitation of sexually explicit material was private. JA122. Nechris also encouraged, in the public chat, engagement in private video messaging with Skinny.freakkk but did not thereby ask for specific material. JA126.

The activity of Nechris through the various channels of the rapey.su site is similar to that of the Defendant in the *DeFoggi* case, which the Eight Circuit found did not satisfy the "in concert" element of the statute. *United States v. DeFoggi*, 839 F.3d 701, 710 (8th Cir. 2016). DeFoggi was a member of the PedoBook site which was similar in purpose and design to rapey.su. *Id.* at 704. In the site's group chats, "DeFoggi wrote at length about his interest in child pornography and solicited child pornography from other members of PedoBook." *Id.* at 710. The predicate acts committed by DeFoggi were *accessing* child pornography, as opposed to "production or attempted production," but that does not alter the fact that Nechris' activities were like DeFoggi's, in that ultimately, they were done "alone from behind one computer's screen." *Id.*

The district court found that Mr. Kuehner had a "tacit agreement with at least three other users" to commit violations of 2251(a) and (e), JA350, but even if this is correct, that is a conspiracy to commit 2251(a) and (e), not necessarily a violation of 2252A(g). Although many of the adult users of rapey.su site may have intended to commit, committed, and applauded the commission of that offense by others, that does not mean they acted in concert with one another to produce or attempt to produce child pornography.[1] To quote the Eight Circuit, "even assuming without

---

[1] Where the predicate act is a different child pornography offense, such as a violation of 2251(d) (advertising child pornography) participation in a message board and mutual encouragement has satisfied the "in concert" element, but the message board

deciding that the child exploitation enterprise offense requires a conspiracy and nothing more, the evidence was insufficient here." *Id.*

For purposes of finding action "in concert," the district court focused on the "group chat" on the site. JA351. Again, however, "group chat" is a bit misleading, since it is simply a continuous chat stream which could have anywhere from zero to any number of members "in the room," but only privy to what is scrolling by at the time they look at the screen. One-on-one conversations were held within that so-called "group chat." More importantly, the solicitation of sexually explicit material was done in either one-on-one or fully private discussions, while the "pee video" and encouragement to others to engage in a private video chat with Skinny.freakkk were posted on the Siropu chat. The government exhibits include various examples of Nechris seeking material for his sole use, most often within private chats. While the Siropu chats were inappropriate and often disgusting, they did not comprise at least three separate incidents of production or attempted production of child pornography in concert with others. Unless the *victims* of the solicitations can qualify both as "victims" and the "others" for 2252A(g), then the evidence is

---

was in fact an instrumentality of the offense itself since that is where the material was advertised. *See United States v. Grovo,* 826 F.3d 1207 (9th Cir. 2016) (defendants being "active participants in the community" bulletin board, it was reasonable to infer "from their activities that they agreed with other members to further the board's common goal of sharing, accessing and viewing child pornography,")

insufficient that Nechris acted in concert with at least three others in the commission of each separate *or* the series of incidents of violating 2251(a) and (e).

## CONCLUSION

The statute under which Mr. Kuehner was charged was promulgated as creating a "new crime," targeting the organized sexual exploitation of children conducted by groups of individuals, usually facilitated by the internet. The sophisticated and organized nature of an "enterprise" as opposed to an individual, or even two or three individuals acting in concert (i.e., a conspiracy) would trigger a harsher penalty than those committing the predicate offenses outside of such an "enterprise." The specificity of the elements was not unintentional and the interpretation applied by the district court and sister circuits treats it as such, undermining the very purpose of the statute by enveloping far less serious offenses (to wit, those committed by individuals or by one or two people, acting solely for their own purposes) which are *already* crimes, punishable by in many cases different mandatory minimums and subject to significant sentencing guidelines offense levels and applicable enhancements.

WHEREFORE, Mr. Kuehner respectfully prays that his conviction be reversed.

## REQUEST FOR ORAL ARGUMENT

Mr. Kuehner respectfully requests oral argument.

Respectfully submitted,
CHRISTOPHER KUEHNER
By Counsel

*s/ Lana Manitta*
Lana Manitta
LAW OFFICE OF
LANA MANITTA, PLLC
140B Purcellville Gateway Drive
#511
Purcellville, VA 20132
703-705-4428
lmanitta@manittalaw.com